*In re:*

Harvey B. Nachman and
  Stanley L. Feldstein

No. 108

### ORDER

San Juan, Puerto Rico, April 11, 1969

In view of the complaint filed against attorneys Harvey B. Nachman and Stanley L. Feldstein, and after examining the Report of the Solicitor General and the record of the investigation performed by him in relation to the actions of said attorneys, the Solicitor General is ordered to file in this Court the corresponding complaint against the aforementioned attorneys.

It was so agreed by the Court as witnesses the signature of the Chief Justice, who dissented. Mr. Justice Hernández Matos, Mr. Justice Santana Becerra, and Mr. Justice Rigau also dissented. Mr. Justice Hernández Matos and Mr. Justice Santana Becerra shall express the grounds for their dissent in an explanatory vote. The Chief Justice will also do it, if he considers it necessary. Mr. Justice Blanco Lugo reserved the right to express, in a separate opinion, the grounds to support the propriety of this order.

(s) Luis Negrón Fernández
*Chief Justice*

I attest:

(s) Joaquín Berríos
  *Clerk*

—O—

MR. JUSTICE SANTANA BECERRA, with whom MR. JUSTICE HERNÁNDEZ MATOS concurs, dissenting.

San Juan, Puerto Rico, May 26, 1969

On May 9, 1966 a complaint was filed in this Court signed by attorneys Francisco A. Gil, Jr., Gilberto Gierbolini Ortiz, and Antonio Córdova-González charging attorneys Harvey B. Nachman and Stanley L. Feldstein with having incurred in practices "commonly known as ambulance chasing." Attached to the complaint there were statements of Edgar Irizarry, sworn and signed before petitioner Antonio Córdova-González on April 26, 1966; of Rafael Dapena, sworn and signed on April 29, 1966 before Carmen A. Carreras, Clerk of the United States Court for Puerto Rico; of Félix Martínez, sworn on February 2, 1966 before District Judge Juan Blaimayar; of Alfredo Arroyo, sworn and signed on February 2, 1966 before petitioner Antonio Córdova-González; of Alfredo Viana Reyes, sworn and signed on April 27, 1966 before Mrs. Carreras, Clerk of the United States Court, and of Gregorio Morales Ayala, sworn and signed on February 2, 1966 before District Judge Juan Blaimayar.

On June 8, 1966 this Court sent the complaint to the Solicitor General so that the latter would perform an investigation and render his report.

On January 18, 1967 the Solicitor General submitted his report together with the sworn statements taken by him in the course of the investigation. On October 31, 1967 we entered the following order:

"After examining the record, and because the professional actions to which the same refers are related to judicial matters under the jurisdiction of the federal forum, it is hereby ordered that said record be submitted to the United States District Court for Puerto Rico for the purposes that said court may

deem pertinent, and without prejudice to any further consideration which this Court may give to this matter.

"It was so agreed by the Court as witnesses the signature of the Chief Justice. Mr. Justice Pérez Pimentel, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages stated that they did not agree to refer said matter to the Federal Court. Mr. Justice Belaval did not participate."

On November 6 and 13, 1967 the office of the Clerk of this Court sent to Mr. Hiram R. Cancio, Judge of the United States District Court for Puerto Rico, the record of the case in full, with the investigation of the Solicitor General, according to the preceding order.

On December 6, 1968 Mr. Hiram Cancio rendered the following judgment which we copy below:

"ORDER—On May 9, 1966 the United States Attorney and the then Assistant United States Attorneys filed a request, in their individual private capacities, albeit on official stationery of their office, with the Supreme Court of Puerto Rico, requesting that the attorneys mentioned in the captioned be investigated for unprofessional conduct. The Supreme Court of Puerto Rico referred the matter to the office of Procurador General (Solicitor General) of the Commonwealth of Puerto Rico for investigation. On January 18, 1967, the matter was returned to the Supreme Court, after investigation. On October 31, 1967 the Supreme Court entered a resolution referring the matter here inasmuch as all of the alleged misconduct related to matters that were tried in the United States District Court for the District of Puerto Rico.

"The United States Attorney has been directed to file a complaint specifying the charges of misconduct alleged to have been committed. No such charges have been filed within the time limit granted by this Court. Upon the Court's perusal of the record, it is not surprising that no charges have been filed because the witnesses' allegations appear not to be based upon any credible evidence of unprofessional acts. No charges having been formulated, the Court hereby dismisses any and all proceedings against said attorneys in this Court.

"A copy of this Order shall be sent to the Honorable Judges of the Supreme Court of the Commonwealth of Puerto Rico in compliance with their request.

"IT IS SO ORDERED.

"San Juan, Puerto Rico, December 6, 1967."

On April 11, 1969 a majority of 5 justices of this Court ordered the Solicitor General to file the corresponding complaint against attorneys Mr. Nachman and Mr. Feldstein. Mr. Chief Justice, Mr. Justice Hernández Matos, Mr. Justice Rigau, and the undersigned dissented. I announced at that time that I would submit an explanatory vote stating the grounds for my dissent. In conformance with said statement I hereby set them forth.

Section 9 of the Act of March 11, 1909 provides that "An attorney or counsellor who is guilty of any deciet, [sic] malpractice, felony or misdemeanor, in connection with the practice of his profession or who is guilty of any crime involving moral turpitude, may be suspended or removed from office by the Supreme Court of Porto Rico."

Act No. 43 of May 14, 1932 in its § 2 (f) granted the Bar Association the power "To adopt and establish, with the approval of the Supreme Court of Porto Rico, such rules of professional ethics as shall govern the conduct of lawyers."

On July 12, 1935 the Supreme Court promulgated rules of professional ethics which were adopted by the Bar Association. The very set of rules adopted provided that the violations of these Canons would be punished by the Supreme Court in accordance with the disciplinary jurisdiction with which the Court is vested by the laws of Puerto Rico.

The professional practice involved in this matter occurred in its beginning in connection with litigations of the exclusive jurisdiction of the United States District Court for Puerto Rico by reason of the matter in litigation and as a consequence of the decision in *Guerrido*. They were suits of exclu-

sive federal jurisdiction, not of concurrent jurisdiction resulting from the diversity of citizenship. When this Court removed the matter to said Forum and ordered that said removal be made without prejudice to any further consideration that this Court may give to this matter, it is my opinion that the reserve was made, and I understand it that way, only in the event that the Federal Court, in the use of its prerogatives and of its own judgment, decided not to act.

The Federal Court, on the contrary, considered the matter on the merits, and rendered judgment according to the order copied above. Mr. Hiram Cancio states in said order that he directed the complainant prosecuting attorneys to file the corresponding complaint specifying the charges of misconduct allegedly committed and that such complaint was not filed. However, the Federal Court made its own careful perusal of the record and it concluded that it was not surprising that such charges had not been filed since the witnesses' allegations appeared not to be based upon any credible evidence of unprofessional acts.

I understand that this case was closed there. To try these attorneys now, after the preceding judgment, and for acts which occurred years ago and which were revived in 1966, it seems to me, constitutes an unjustified prosecution, not only in the light of the foregoing, but also in the light of all the other circumstances in the record which could be connected with that professional conduct so difficult to explain under precise views which characterize the attorney as an ambulance chaser.

In addition to the aspect of the matter to which I have referred, considering the record before us, giving to the sworn statements all the weight appearing from their faces without presently judging their credibility or incredibility, from the value of the content in itself of said record and of its circumstances, I understand that there is no ground to determine probable cause for the disciplinary prosecution of

these attorneys in the light of the rules of law allegedly violated. The foregoing forces me to make a recital of the facts in the record.

*Guerrido* v. *Alcoa Steamship Co.*, 234 F.2d 349 (1st Cir.).

As the background from which originates the situation herein involved, and through which many of the references made in the course of the investigation are understood, I must mention at this point the decision in the *Guerrido* case.

On October 7, 1955 the United States District Court for Puerto Rico dismissed a complaint in a suit in admiralty instituted against the vessel M. V. Corona and the Alcoa Steamship Co. by a laborer who sustained injuries while he was aboard said vessel which was discharging cargo at the San Juan bay.

The Court dismissed the complaint under the proposition that the Workmen's Accident Compensation Act is applicable, with respect to those injuries, to the exclusion of any substantive cause of action granted by the admiralty laws of the United States, and that the substantive admiralty law upon which the claimant based his complaint was inoperative in cases of injuries which occurred in waters of Puerto Rico. (134 F.Supp. 459.)

On June 8, 1956, the Court of Appeals for the First Circuit reversed. It held that that laborer injured aboard a vessel in San Juan bay had a substantive cause of action on admiralty to claim damages.

Knowledge of the decision of the Court of Appeals gave rise, inevitably, to the fact that all those laborers who had sustained injuries aboard vessels in the territorial waters of Puerto Rico tried to exercise their right to raise claims under the admiralty law and to do it before, because of "laches" or delay, their causes of substantive action would prescribe. This decision is responsible, fundamentally, for what occurred in the Federal Court in Puerto Rico in the

period which followed the same, in relation to respondents' professional practice.

In the case before the United States District Court where the complaint was dismissed, the claimant-worker was represented by Golenbock & Komoroff, a law firm of New York. In the Court of Appeals, where the cause of action on admiralty was sustained, the laborer was represented by Jerome Golenbock together with Harvey B. Nachman and the firm Golenbock & Komoroff.

### Testimony of Mr. Stanley L. Feldstein, offered before the Deputy Solicitor General, on October 28, 1966.

1. He graduated from the School of Law at the University of Columbia in June 1950. He practiced law in New York until 1953, when he came to Puerto Rico. Because he did not master the Spanish language, he worked as insurance adjuster until 1955, when he passed the bar examination and commenced to practice law in 1956.

2. He studied together with Mr. Harvey Nachman in the School of Law of the University of Columbia and they became close friends. Nachman, who was married and had a daughter, had to work to pay for his studies. Feldstein took notes for him in the classes which he could not attend. Nachman worked in New York in the office of Jerome Golenbock (attorney who litigated here and on appeal the *Guerrido* case). Before Feldstein came to Puerto Rico, Nachman introduced him to Golenbock, and gave him letters addressed to attorneys in Puerto Rico, among them Mr. Arturo Ortiz Toro, in whose office he spent a lot of time.

3. Even before opening his office, in 1956 Nachman sent him a personal letter telling him that they (Golenbock firm) had several longshoremen cases in Puerto Rico, and that they needed a local attorney to take charge of a small office that they had at the Maritime Warehouse building. He was offered a salary or a share for taking charge of the office. He

accepted because all the resources he had to open his office was $450, a bonus of one-and-a-half times his salary granted to him by the insurance company when he quit his job. He agreed with Golenbock to receive $75 weekly for his work in the cases of Golenbock and 27.5% of the gross income of the office. For about one year he did not receive the $75 weekly and the deponent lived on his wife's earnings and on a few small cases that he transacted. In the year 1957 the cases commenced to reach the trial or transaction stage. The first cases were appealed because this was a field "new in Puerto Rico. Nobody was sure what was the law."

4. In 1958, during a NACA convention he was Golenbock's guest in New York. Forced by the latter, and his wife being pregnant, he was constrained to accept a decrease in the percent and also to give Golenbock a participation in the proceeds of his cases. At that time the deponent knew nothing about admiralty and when the cases came to the trial stage, attorneys from the New York office came here. Several of them came, among them Nachman. He had the broadest experience, and, in 1958, he established himself permanently in the office in Puerto Rico with Feldstein. In view of the discrepancies with Golenbock as to his participation, in December 1960, they acquired the latter's interest, and in 1961 they practiced as Nachman and Feldstein. In August 1966 Mr. Héctor Laffitte, from Hartzell's law office, joined them as partner. Since 1960 and thereafter, several other attorneys worked in their law office.

5. From 1957 on, some persons, whom they called investigators, worked in the office. Their work was to take statements from witnesses, to take persons for medical examinations, to serve notices and summons, to communicate with the clients, and also to serve as chauffeurs and as messengers.

6. One of them was Edgar Irizarry (1960). At that time the deponent did not speak Spanish as he does at the

present time, and many times he could not understand the language of the longshoreman.

". . . Another problem was the deluge of work in the office, because when the news spread through the docks that there were attorneys who took cases of accidents in the docks and 'they had the right'* sometimes I had 4 or 5 persons in the office in Maritime Warehouses to ask: 'Mr., am I entitled to federal insurance?' They were mixing two matters. Possibly they were thinking of the Insurance Fund, but they also knew that this was a federal matter and they called it federal insurance.** I needed some help. 'I was not in need of an attorney, because the work did not require an attorney,' but rather a messenger. My wife knew Edgar Irizarry because he worked with Pan American, in the Cargo Division where she worked. . . . She told me that Edgar 'mastered the two languages' and that he was a nice person and that she believed that he was the right person; and also, it would represent advancement for him, and he would part with manual work. I interviewed him . . . and recommended him to Golenbock and he was hired. Then the time came when Edgar said that he could not accomplish all the work, because they practically investigated the cases. For example, when we took a case involving an accident I asked him to go and take photographs of the scene. If it was a case of the State Insurance Fund, where an accident had been reported to the Fund, I asked him to go to the State Insurance Fund. First, we acquired the information, but it took too much time; and then Golenbock sent me a portable Photostat machine and they went to the State Insurance Fund to make the photostatic copies. Well, in short, the work was too much for him and he (Edgar) recommended this boy, Pepín Rodríguez. He and Pepín worked together. Pepín quit and Edgar recommended Dapena; and Dapena and Edgar worked together until Edgar resigned and then Dapena continued doing the work alone. For intervals we hired the

---

\* Judgment in *Guerrido* (1st Cir.).

\*\* Judgment in *Guerrido* (1st Cir.). The confusion and uncertainty of these laborers can be accounted for. Actually the judgment in *Guerrido* (1st Cir.) interpolates and interrelates both remedies; the local one under the Workmen's Accident Compensation Act, and the federal one, under admiralty laws, exclusively under the jurisdiction of the United States District Court.

one who is an attorney now, Raymond Sandoval. He studied and worked. We had and still have the practice of not permitting those students in the office without paying them something, since we knew they are poor boys, and we paid every one of those students the minimum federal wage fixed by law for the hours worked in the office. Raymond Sandoval worked for a time and wanted to stay, but I thought that it would be more convenient for him to work in another office, and then, on recommendation, I believe, of Marshall González of the Federal Court, Antonio Alvarez, the boy working for us at the present time, came. Thus, Pepín Rodríguez and Edgar worked together; Dapena and Edgar Irizarry worked together; and if I can remember well, Dapena and Sandoval worked together.

. . . . . . . .

"These workers' representation taken by the office, representation of dock workers, was it centered in a certain area of the island?

"It covered the entire island.

"Mainly what areas?

"I cannot tell that, particularly, any specific area. It covered all . . . the entire island. The majority of the cases came from the Metropolitan Area. Also quite a few cases from Mayagüez and Ponce, and some cases from . . . for example, Arroyo, Punta Santiago, Fajardo. I am referring to maritime cases. There were other cases, not maritime.

"What is your position as to the solicitation of cases for the office in relation to these persons: Dapena, Irizarry, Rodríguez?

"They did not solicit cases, neither upon my suggestion nor to my knowledge; and possibly, if you allow me, I can explain to you how we worked. When I started to work with Golenbock, I was introduced to Juan Pérez Roa, Chairman of the Unión de Trabajadores de Muelles y Ramas Anexas, by Golenbock. Through Juan Pérez Roa I met Pedro Grant, who is my client at the present time, and who at that time was secretary or organizer of the Union. Pedro Grant was the one who introduced me to the Chairman there in Ponce, who was . . . just a moment . . . Pedro Rosa and he introduced me also to the Chairman in Mayagüez. I think the first one was called Rodríguez Avilés, and then he was substituted, that is, there was a change, and Roberto Crespo was appointed. I was also introduced to the

Chairman of Humacao, whom I have not seen for many years, but I can recognize him if I see him, stout, tall, of fair complexion. When I started in the office there were cases, that is, cases had been taken by the office, and my first job was to investigate those cases. To take sworn statements and all the data to prepare them for the filing or the hearing thereof, whichever the case. Pedro Grant introduced me to said persons and I requested, or rather, Pedro Grant suggested that I be permitted to use the Union premises to carry out our investigations. It must be understood that in the Metropolitan Area it is very different from the Mayagüez Area, for example, in Ponce, Humacao, and also in Punta Santiago. The premises in those places were frequented by the workers on the days they did not work to play dominoes, to chatter and to spend the time with their co-workers. Many of these persons did not tell us, when asked about their address, that that was the address of a sister or of a friend, or that they did not live in that place, but that they received their mail there, because there was no mail delivery service where they lived. It happened that many times letters were addressed to them, which were not returned, but were not received either. We also had the problem that when we asked the client for the witnesses' names, he said: 'Mister, I do not know the name.' For example he gave us names like 'El Negro', 'El Sapo', 'Tortilla'; I am trying to remember some, 'El Pirata', 'El Tuerto'; one who was called, for example, 'Dorado', because he was from Dorado, and simply, there were no means to localize these persons except by going to the place and inquiring: Who is 'El Tuerto'?, for example. At best, the very teamster did not know, but somebody would say, 'Oh, yes, "El Tuerto", he lives right up here.' Furthermore, as to their means, and it must be remembered that the group of men who worked in the hold of a vessel consisted of 8 workers, 2 'winchers', 1 tye runner, a foreman and the apron men. I was instructed by my partners and colleagues, that in order to have a case that was not going to . . . eh . . . would not fail in court, the best thing to do was to procure statements even from those who said that they had not seen anything. The purpose was to locate every person who could testify, even though he only testified that he did not see anything; and the only way I could figure that it could be done was by resorting to those persons, and so we did, and the

easiest way was through the Union, because all their life centered around these premises of the Union. It was their social club, their source of income, and persons having similar interests to those of their friends came there. Now, there is something else. Even if I could locate all the members of a gang by their names and addresses, if I sent for those workers to come to my office, I would not say all of them but the majority came with the story 'Please, Attorney, I have lost a turn of work in order to come here.' I told them: why did you not come on another day when you were off. 'I was not told.' Which meant that they expected me to compensate them the turn of work lost for coming to offer the sworn statement. I could avoid all that, although I always paid for their traveling expenses. I avoided all that by going to the Union and taking their sworn statements therein, because if I saw the worker there, then he was not working. Besides if he was working that day, I could, excuse me, postpone the taking of the sworn statement until another day, and I could find out what day he was off, in order to take his sworn statement during his free time, thus avoiding problems, and so I did. At first, most of the times I went personally, accompanied by Edgar Irizarry, and sometimes not accompanied by Edgar Irizarry, depending on whether I went by plane or in his car. For example, when we wanted to investigate a certain case, what we did was to accumulate cases until we had 5 or 6 for investigation in Mayagüez. In that case, it was worth while that a person from the office make a trip to take the sworn statements. Many times I called the Chairman of the Union on the telephone, or any other person connected with the Union and told him: we want to see the witnesses of the following cases; we will try to go there on Friday. They posted the notice on the bulletin board and that helped a lot, because even the witness we did not know about, if he saw the notice he would say: 'John Doe, I was working with him that day,' and the witness appeared there. It was a manner of localizing the witnesses and it represented economy. After I had worked for some time they called me from the Union: 'Attorney, John Doe is here. He suffered an accident and wants to talk to you.' I would say: tell him that I plan to be there on such a date; tell him to see me at the Union. I went and spent all day there. I did not have to go around. That was a method of operation that all of them knew and I did too; and I obtained the cooperation

of the Union, because, if, for example, I wanted to see a particular worker, I said to the Chairman, or whoever it may be, I want to see John Doe. He called any worker who was around: 'Go and bring John Doe.' To me it represented an economy of time and there was no other way to operate. I do not know whether I have answered your question, but I have tried to give you a clear idea of how we worked.

"Did the two office partners, you and your colleague Nachman, go sometimes together?

"Rarely, because it must be remembered that Harvey came to Puerto Rico in 1958, and he did not speak Spanish; and up to the present time he speaks it rather poorly; I do not tell it to him, but he does speak it poorly. Yes, Harvey went with me on 2 or 3 occasions, but it was rather to introduce him to the workers. He could not take a sworn statement because he did not know Spanish, and the workers did not know English. Sometimes he went to see the scene of the case. I remember the case of Federico Marín Gutiérrez from Ponce, which was taken to the Supreme Court of the United States, and we won it. In that case, since we wanted to see the place where Federico had been injured, to see the position of the vessel so as to have a mental picture in order to realize what we were alleging, I remember he and I went there; and on other occasions, too.

"Did Dapena and Edgar Irizarry go alone sometimes?

"Yes. Definitively. For example, if we were going to . . . how shall I say it? . . . if there were 5 or 6 cases, they went alone. In fact, we made a distribution. Dapena is from Ponce. He has family relations with the Dapenas of Ponce. He was assigned Ponce as his area, and Edgar Irizarry, Mayagüez, because he was born, I think, in Cabo Rojo.

"The payment of the attorney's fees of these cases where you represented the workers, how did the workers pay for it?

"Always on the basis of a third part. From the beginning we established that. In no case would we charge less than that. In some cases when due to the development of the case it was not possible to transact the same because we thought it was worth more, I am sure my colleague knows, defendant's attorney himself is mistaken, and it is not until the case is investigated as a whole, that he realizes it, since for example, if the injury involved was not too serious, but due to the question of liability the worker could not receive less than three or four thousand

dollars, then we credited the attorney's fees. That is, we accepted less than a third in order to give them more. I want to state that in each one of these cases, this I have to be grateful for to Golenbock, because he was the one who taught me this: in making the distributions a check was never cashed nor was it delivered to the client. What we did was to receive the check; deposit it in our account; and in the same act we returned the remainder. That is what we called the final distribution. It stated at the top: 'So much received in transaction or judgment.' Then underneath it said: 'Attorney's fees deduction, so much; so much for the doctor's examination; John Doe, so much; deposition, so much,' because in all the cases we took depositions. In nearly all the complaints their law office is almost always Hartzell, Fernández, and Novas law office. The total deductions were stated and then it said: 'Net amount paid to you by our check No. — of such a date,' and which distribution was signed by one of the attorneys of the office. Together with the check in liquidation of the case, the original of the final distribution was delivered to the client, and the client signed the copy which remained in the record and where it was stated: 'Received accordingly,' and his signature. Thus, in each case there is a complete distribution in the office record and another in possession of the client.

"Was not the client required an advance payment when he delivered the case to the office?

"Colleague, do you know the Puerto Rican longshoremen? I had, for example, a set of questions in the fact sheets. The boys did that, too. A fact sheet was taken when a person came to the office; when I was busy I would say, take his fact sheet; that was the worker's personal data; his version of the accident; and then, in the fact sheet, the personal history of the man. I asked one from Cataño, I believe, married or single? 'Single with family responsibilities,' and I did not know what he meant by that. He explained to me that he was single, but that he had 13 children by four women. Simply, these workers did not have money to pay. They lived from one turn to the other. It is so much so that if I summoned one from the island to come to San Juan, I was often required to pay the traveling expenses before coming, because he did not have money to pay for them. That is, they required me to pay in advance.

"Were you, on any occasion, conscious of the fact that your law office had attained control over this type of longshoremen accidents?

"Truly, I do not understand the question. But, if you ask me whether I knew that the persons talked about our taking longshoremen accident cases, sure, my colleague, because many times persons entered the office and said: 'I want to see the Americans' or 'I want to see the American Attorney,' and, by the way, I look more like a Latin than an American. More than once they did not believe that I was the person they wanted to talk to; and my secretary, who has been working for me for a long time, in that office, can very well attest to this. She started to work in March 1956.

"On all the occasions when you went directly to the premises of the Union, and also your employees, do you know whether any other law office was conducting similar negotiations in those premises?

"Yes, sir. But what happened is . . . I did not know they were conducting similar negotiations on the same premises. I mean, that I knew of other attorneys who took cases of this nature, maritime cases. I knew it personally because they referred cases of this nature to me. Arturo Ortiz Toro, Manuel Abreu Castillo, Antonio Amadeo, César Andreu Ribas, William Morales Torres have referred cases to me. Some more: Gerardo Ortiz del Rivero, René Benítez; that was the case of a sailor who, I think, lost his life near the coast of Ecuador, Perú. There were more.

"Did you meet there with other attorneys?

"No.

"Do you know Félix Martínez?

"Yes.

"Did you have any connection with him when you conducted those investigations?

"Yes. The connection I had with Félix Martínez, . . . before I knew Félix Martínez, when I started to visit Ponce, I think Isidoro Rodríguez was the secretary-treasurer of the Union. I know him as Lolo, but I think his real name is Isidoro Rodríguez. He was the secretary-treasurer. At that time, Pedro Rosa was seldom at the Union premises when I went there. I think it was Lolo who helped me when I went to Ponce. I used to call him on the phone: Lolo, I am going there on Friday . . . please

summon the following persons for me, or I sent them notice to meet me there. On other occasions, for example, every Friday, or almost every Friday, we set the date for the depositions of 2 or 3 cases. Harvey wanted to take the sworn statements, and of course, I had to attend and act as translator in the deposition. When two or three witnesses had to be brought from Ponce, I often called Lolo and told him: Lolo, please bring John Doe and Richard Roe on Friday. At first, I told him to send them. Their expenses were paid for, and they were charged to the case. Later on, Lolo said that he had a car and that he wanted to earn some extra money, and asked whether he could bring them; and it was done so. I paid Lolo. I had the advantage of certainty, because the main problem was the nonappearance of these workers. An appointment was made with a doctor, and the doctor was waiting for the man, and the latter did not appear. The notary and the stenographer were called and the witness did not appear. Time was lost and friction was created with the other attorneys; and so, having a reliable person in charge, I was certain that they would come. Lolo was the first one; and when Lolo was appointed secretary-treasurer, then Félix Martínez did the same.

"Did Martínez also accompany the workers to San Juan?

"Yes.

"Did he have an automobile?

"He had . . . if I can remember well, an old Ford. He also did something else. When I went by plane Félix picked me up at the airport and took me to the Union and to any other business, and then he took me back to the airport."

6. (Deputy Solicitor General)

"I have no more questions. If you have anything to add you may do it.

"Yes, I want to add something, my colleague. In the first place, it seems to me that my colleague knows what promoted this investigation, or rather, what gave rise to the complaint which was the reason for this investigation. In or about 1964 or 1965 Gerardo Ortiz del Rivero referred to our office the case of a widow from Cataño, whose husband was a mentally disabled veteran confined in Clínica Juliá, under the auspices of the Veterans Administration. He went home with a permit or pass

to spend the weekend. According to the version given to us, after the weekend, instead of reporting himself to Clínica Juliá he reported himself to the Veterans Administration, by the way, let me tell you that I am speaking of a subjudice case, but I presume this is confidential, and that speaking about this subjudice case will not be considered as an offense; when this veteran reported himself to the Veterans Administration, according to our information, it was for the purpose of requesting treatment as an ambulatory patient in order that he could do 'odd jobs' to help his family. He was informed that he could not be discharged until after 30 days, by a doctor's authorization, but that they were going to let him remain on leave, and gave him a vial of the pills he was taking, which represented the supply of pills for a period of 30 days. It is evident, my colleague, he died that day, from having taken all those pills. When we took that case, as we do in every case, after speaking to the client and after she came to the office, we filed the corresponding complaint. What I recite to you now is hearsay evidence, because it was with my partner Harvey that the foregoing happened. The widow called to the office very excited to inform that a so-called investigator was at her house. I do not know what he told her, but she was under the impression that he had threatened her to discontinue her pension because she was bringing suit against the very government which was paying her the pension. My partner, Harvey, called Paquín Gil and told him: 'Look, Paquín, you are a litigant's attorney, nothing more. Since in a civil case you are just another attorney, your client is just a litigant and you got to leave my client alone and communicate with her through my office.' Paquín Gil said that it was not his policy to intervene in interagency matters, if they may be called so (interruption)

"That Paquín Gil is the United States Attorney Francisco (interruption)

"Francisco Gil, the United States Attorney. He said that he was not going to intervene in that matter. That he did not have authority therefor. Harvey told him: 'You are the attorney of the United States of America in this case, and any action of any agent of the United States of America must be subject to your control.' Harvey also warned him that if it happened again, he was going to resort to court demanding protection for our client. After a few weeks it happened again. Harvey prepared a motion

to be filed in the federal court alleging that they, I do not know whether he alleged violation of the rules of ethics, I believe so, in communicating with our client, and requesting the protection of the court for our client. As a matter of fact, when I read the motion I told Harvey, the language is harsh. But Harvey was disgusted with United States Attorney Gil. In the motion he demanded measures to protect our client. Furthermore, a certain friction was being drawn along between us and United States Attorney Gil. We had a case against the Navy where we discovered certain documents, and nobody from that office appeared to make the inspection of said documents. They were surprised at the trial, when we could establish our theory using their own documents. It was a case from Vieques referred to us by Germán Rieckehof, where a public car chauffeur lost his arm injured by a Navy truck. From our investigation it appeared that the two sailors had a common girl in the cabin of said truck at the time of the accident, but that girl was married to a Puerto Rican who was in the Navy, but outside the island, in the United States, and she did not want that it be known that she was there with two North American marines while her husband was away. But she had told another witness that when they passed the curve of the road in Vieques and the chauffeur of the Navy truck saw the light of the public car coming in the opposite direction, he put his hand on her head and pushed her under the dash, and it seems that said movement caused him to lose the control of the truck and brushed the side of the public car injuring said man's arm who was resting his arm on the open window. In that case the United States Attorney served notice to the witnesses by official summons delivered by a United States marshal for the witnesses to come here to the office of the United States Attorney in the Federal Building to offer their ex parte statements. That girl came here to this building, but her sworn statement was not taken. Now then, we believed this was susceptible to criticism because the function of an attorney discharging a public position, we believe, his function and his duty goes beyond the duty of an attorney representing a private litigant. We know about that; and when this other incident occurred we thought it was the proper time to stop that practice. My partner and I considered it extensively. It was our opinion that if they desired to take sworn statements from the witnesses the proper thing was to go to them to take the sworn

statements, like we had to do. To serve them notice for depositions was . . . . We believed that the prosecuting attorneys did not have the power to serve official summons in a civil case. In fact, we were informed, I do not remember by whom, that it was a ruling or what may be called a promulgation of the Attorney General of the United States, precisely, not to serve summons in civil cases during the investigatory stage. Then, in the presence of this situation, and of the animosity, I must admit that, unfortunately, as we commonly say, I do not mince words, when a person asked me, a person close to me and close to United States Attorney Gil, how did I consider United States Attorney Gil as a candidate for Federal Justice, I expressed my opinion; that he was utterly incompetent. An error of policy, lack of tact, but a sincere opinion. I know that United States Attorney Gil was informed of this; because soon after that he stopped talking and greeting me. When my partner and I filed that motion Harvey argued it. I was not there. After one or two continuances the court directed United States Attorney Gil to cease doing that and he had to cease interfering with our client in this case. To order the Veterans Administration, or whoever it may be, to cease visiting our client. This was not a criminal case. They did not have the power to investigate in that manner. When Harvey came to the office after that hearing he told me that one of them, either Gil or Gierbolini, said something in the hall, something, and I do not cite the exact words because I do not remember them. He said something about getting back at us. It was a short time after that that I heard, and I do not know who told me, but I do know, that one of the prosecuting attorneys, and I do not know who, told Adonis Nieves, who worked for us, and who is still my friend, Adonis told me that they were investigating us and that they had evidence and that they had a good case against us. I did not pay any attention because I thought those were empty words. That is one of the things I want to make clear. The other thing I want to make clear is that now I am being a victim of extortion by Edgar Irizarry. Excuse me for standing up, but I am excited. My life is involved and that of (interruption)

"Do not worry.

"And the life of my wife and children is involved, too. When he came to work for me he was paid by Golenbock. His checks came from New York, as well as those of the secretary

and mine. I had, presumably, $250 monthly in an account here to maintain the office. For many months those checks did not arrive. At the end of each month I had to send to New York all the stub books and the vouchers, the bank statement, and the checks, and that was sent to New York. Insurance Fund, everything was paid from New York. When Eddie came to work for me we became close friends, to the point that he asked me to be the best man in his second wedding. It must be explained because, as I understand, there have been four. He had to request a special permission from the priest in order that a Jew could act as his best man, in a catholic church. Our friendship was closer than any co-workers' relation. Socially, we went out together and we were friends. He knew all my family and I knew his. We visited each other. Sometimes I was the adviser of his wife, Hilda, and himself when they had quarrels. I tried to calm them down because he has always been impulsive and I tried to bring peace; Hilda, his second wife, can attest as to that. About 1961, by the end of 1961, Eddie came to me and said, 'Stanley, I am going to resign. I am going to join a company, a candlestick factory in Cataño, with two Spaniards, and I think it will be better for me there than here.' Who would oppose? Here, everyone has to seek his own progress. Furthermore, he had always been a business man. During the time he worked for me, his father always kept a soda fountain in Cataño, in Bay View, but Eddie managed the business, because his father was always sick. Later on he took charge of the gasoline station which was next door to the business, I think it was a Shell Station. Sometimes he disappeared during 3 or 4 hours because he was waiting for the gasoline delivery. Sometimes I scolded him because I thought it was not fair. Once he got into the hog-raising business in ward Caimito. When he told me that he was going to resign I told him: good luck. We parted; if I can remember well, although he was resigning I gave him a bonus. If I can remember well that was so. All the employees have received a Christmas bonus, and not always the same amount; because, honestly, if anyway I have to pay it to the state treasury, then I rather give it to those who have helped me to make it, and I do not think that that is wrong. Eddie quit. A short time later he came to me and said: 'Stanley, you have got to rescue me because the ten thousand dollars I invested in that factory are lost, and now those two Spaniards demand from

me ten thousand dollars more to rescue the first ten thousand.' By the way, the first ten thousand belonged to his first wife, because he obtained the divorce from the second wife to remarry the first. One Saturday or Sunday I went to the factory in Cataño. I went with my wife and two children. I saw the factory. I talked to the two Spaniards, or Venezuelans, because in Venezuela, specially during Batista's regime, no . . . that of dictator Marcos Pérez Jiménez, they had to leave the place notwithstanding they were very rich people. When I saw the factory and asked for the financial statements of the business they handed me a statement which showed they had $400,000 invested in machinery. I told him: Edgar you are a fool. Here, there are not $400,000 invested in machinery; not $40,000; I doubt if there are $4,000. I would work for you without pay any time, but I owe nothing to these Spaniards to work without pay for them. I do you a favor by not intervening in this matter, and I advise you to get out of it. I was surprised: what Eddie expected was to make me a partner and that I would invest $10,000 in the business. I told him definitively no. A short time later he came to the office. He entered slamming doors, yelling, using dirty words right in the office. The matter was that he claimed extra hours worked during the years he worked in the office, I did not know how much he asked. He had never presented a claim. When he resigned he did not mention it; and I thought it was unfair on his part, after losing his money in a business, to try to obtain the money lost from me, and that is the way I saw it. Since he did not calm down and was yelling in the office, I came out of my office to speak to him; and I cannot recall how it was, but I do recall that I had my eyeglasses on, because I wear eyeglasses, and when I came out of my office I know that Miguel Matos was trying to calm him down, trying to take him out of the office telling him: 'If you have a claim, go to the Department of Labor, and do not come here to cause a scandal.' When I was going out of the office I was going to take off my eyeglasses to speak to Eddie, but he did not give me a chance to take them off. He told me: 'Do not take off your eyeglasses'; and then he gave me a blow with his fists and threw me against the wall, since Eddie is taller and stouter than I am. Then Miguel Matos intervened, and at last, somehow, he took him out of the office. I cannot remember very well what happened in that incident because I was stunned. Then I started to receive letters from

the Department of Labor informing me that Edgar Irizarry had filed a claim for wages. I would have gone to the administrative hearings, but I had gone to some as an attorney, and the claimant was always there; and truly, I wanted to avoid a personal encounter with him. Then I consulted a person whom I considered a good attorney on the matter, Ramos Vargas, Rieckehof's partner, and I asked him to represent me in that case. He advised me to do nothing, and not go to the administrative hearings because nothing was decided in those hearings. That I should wait for the filing of the complaint and then he would assume my defense. I thought that if Eddie had any claim against me it would be from January 1, 1961, when the office passed to me. If he had a claim previous to that date, that pertained to Golenbock, because I was not Eddie's employer then; I was his coemployee; and also, this was not a claim for a few pennies but for nine thousand odd dollars. We continued to receive letters from the Department of Labor, but never a complaint. I forgot about the matter. Whenever I received a letter I sent it to my attorney, Ramón Vargas. And it remained so. After the claim I do not remember, yes, I do remember, I was trying to locate Pepín Rodríguez because Pepín owed me some money. I lent him money to help him. When he worked in my office, he gave, I presume that what I disclose in this office about another person, shall not be used against said person (Interruption)

"It is confidential.

"Pepín Rodríguez bought a house in or about 1957 or 1958 and gave a check for $800 as down payment, and the check was not covered by his funds. I do not know whether he was called from the prosecuting attorney's office or by the person to whom he delivered the check, but he was given a term of 24 hours to appear with the $800, or otherwise they were going to take action. It happened that precisely at that time Golenbock was here in Puerto Rico and I asked him permission to lend that money to Pepín. Golenbock denied the permission. I, on my own, gave him a check of the office and I paid back the $800; and Pepín and his wife, without my request, went to Alberto Picó and executed a mortgage deed voluntarily and issued a promissory note in my favor for that amount. He never paid it to me. His house was foreclosed. Mine was a third mortgage and I got

nothing. Until last year, I believe, the prescriptive term to claim a debt, even if secured by mortgage, was six years. I thought that the mortgage was already void. By mere chance I met Pepín in the street and I reminded him about the matter and he gave me a telephone number and an address where, presumably, I could communicate with him. It happened that, I do not know why, he was not found in either place. I prepared and filed my complaint and started to look for him to summon him. At last he was located. Then he came to see me and said: 'Stanley, I am bad off. I am working in collections to earn a living. But, if I make something I will pay you, but let me make the collections from your clients. Furthermore, if you can find a job for me, so much the better.' I like Pepín, because in spite of his lack of commercial ability he is a good person, and actually I tried to refer to him nonrecoverable judgments, of which I have several, accounts receivable; not accounts owed by my clients, but accounts referred by my clients for collection. This I did trying to help him. Pepín has not paid me yet. But Pepín told me that he had met Edgar Irizarry and talking with him he found out that Edgar had offered a sworn statement to the United States Attorney and that an investigation was being conducted. What he talked with Irizarry I do not know. What I do know is that on those days Pepín visited me and told me that Edgar Irizarry had told him that if Harvey and I gave him two thousand dollars, he would not sign the sworn statement; he was not going to testify; he was going to withdraw what he had said. I told Pepín: I am not going to commit offenses, and that is an offense, and I am not going to permit extortion. Because if I give him two thousand dollars that is the beginning not the end, and then he surely will have a weapon and Edgar may say whatever he pleases. Somebody will have to judge. Then Pepín told me that Edgar had offered a sworn statement and this is what Eddie declared or told to Pepín. In part he said that somebody had promised him some fees, which I never did; that he was not going to testify who had made the offer to him. That if we gave him two thousand dollars he was going to say that it was Golenbock; that if we did not give him the two thousand dollars, he was going to say that we did. Immediately I told this to my partner and to two other attorneys. I caused an attorney to be present when Pepín told me that. I called him to sit down and listen to that. I did not take a sworn statement from

Pepín. I have asked him to go to a notary to offer it. One more thing I want to explain. You ask me about Félix Martínez. I have not seen Félix Martínez since 1960, I should say. And he has not seen me either. The last time I saw him, and I can determine it, because I have been in only three offices in Puerto Rico, one in Maritime Warehouses, another on top of the International Harvester at Stop 2½ Fernández Juncos, and the third office is the one I presently occupy at Edificio Ballester, in the premises previously occupied by *Comité Presidencial del Partido Popular*. I can determine when I saw Félix Martínez for the last time. I started in Fernández Juncos on August 1, 1961 under a five-year contract which expired on July 31, 1966. Félix Martínez never went to that office at Fernández Juncos. The last time I saw him was in Maritime Warehouses, the original office. One day he came to that office and told me that an attorney, not from this jurisdiction, from abroad, had offered him to establish an office in Ponce and to put, if I can remember well, not Félix, but his son, in charge of the office for all the work in relation to these services. Félix told me that he was offering me the opportunity to do it with him. I told him: Félix, I cannot do that, and I am not going to do it nor have the most remote intention of doing it. Félix told me: 'remember that I cannot work anymore for you and if I can refer cases to the other attorney I will do it.' He was the Secretary-treasurer of the Union. I told him: bad luck. He went away; and to the present time I have not seen him again. Lastly, I am taking too much time, colleague, lastly, I want to explain: It has been spread about that I am a millionaire and that has brought me, as I would say, bad faith, gossip from colleagues and other persons. For heaven's sake, if I stop working for one month my family would have nothing to eat! I have an apartment which I bought with my savings during all my years of work and I am paying for it in monthly instalments. Paying the same amount I would be paying for rent in another person's apartment. I have a two-cuerdas parcel of land in El Verde which I bought together with my sister-in-law because my mother-in-law has always lived in places where there are flowers and she wanted to have a place to go on weekends. I think she is 80 years old now. We bought that parcel of land and paid, I think, three thousand dollars per cuerda, and now we constructed a small concrete house, which I constructed with money

from the office, having to pay $300 monthly with . . . which is deducted from my salary. This year I was extravagant in buying a 'Buick Wild Cat.' The first time I have a luxury car and I bought it because it was the car of Toño Lebrón, Comptroller of the Caribe Motors, and my brother-in-law's boss for over twenty years and a close friend of mine and he bargained the car for me for five thousand dollars. Aside from 90 shares of stock of the Commonwealth Oil, one thousand odd shares of Girard Industries, which I bought because I was attorney of the company, and now their value is two dollars less than what I paid for them, and an investment of ten thousand dollars in the company which constructed the building where my apartment is, investment which is also lost now; aside from that, my bank statement is approximately two thousand dollars, and aside from that, I offer to the Solicitor General and the Supreme Court for investigation all my books and income tax returns, all my personal records since I arrived in Puerto Rico, and all my belongings in this world to offset the idea that I am a greedy person, who has tried to unduly enrich himself through his profession. From 20 to 30% of the work done in my office has been done free of charge. Up to now it may be inquired not only from Clemente Ruiz Nazario but also from Cancio, who entertains the Social Security cases in the Federal Court. I do this work gratuitously. In fact, the court assigns those cases to us. I believe that during the first two or three years of my practice of law in the Industrial Commission, I waived my attorney's fees in all those cases. I am going to tell you why. I was a foreign and unknown attorney. These workers came to me. Many of them were not entitled to any case. Upon my word, I did not want to reject those workers without offering them some kind of service, giving them a flat denial, because I thought that each one of those workers upon speaking with their co-workers, with their friends who had difficulties of the same nature, would think of me. If that is wrong I do not understand why. The only advertisement of an attorney is a contented client, and that I tried to attain. I represented them in the Industrial Commission and when the Commission increased the percent of incapacity, which entitled me to attorney's fees, I told the Commission: I waive my right, I waive it in order that the entire sum be paid to the worker. Raquel Nigaglioni can attest thereto. She has known me and has seen me around there during all

these years. If I should go to solicit cases, I presume it would be for the purpose of enriching myself, not to work for months without pay. How did so many workers come to me, the co-workers? I cannot prevent that situation, because when there was a maritime case they sent it to my office, and I accepted their participation, which I call 'refer fee', which I consider correct, since they are attorneys. I have not paid anybody for referring cases to me, if that is what is alleged. I have not gone in search of cases either. Thank God, I have had no need for that. When the news spread, when the first suit was won, it was impossible to refrain those workers from coming into my office. Even rows were formed there, and the only thing I could do was to take the 'fact sheet' and I did not tell them whether or not I would represent them. Let me explain to you something that I think you do not know. In June or July 1956 the case of *Guerrido* v. *Alcoa* was decided, in which it was established that this type of action could be brought in Puerto Rico, because, since the case of Lastra in 1924, no case had been brought. I think I did not participate in the case of Guerrido. It was decided in the Circuit Court a few months after I started practicing. I did not even know of the existence of such a case. Then, when the workers started to come to my office: 'Oh, Mr., am I entitled to the Federal Security?' Some of them had cases which had occurred 3, 4, 5 years before. They did not remember the dates, nor the vessel, nor did they remember the witnesses, but the evidence of the accident they bore on them, their incapacities. One from Río Piedras had lost an eye. I do not remember very well, but he scared me, because one day he composedly told me that he had served some time in the penitentiary for having killed another man, I think it was the Mayor of Río Piedras, or of Arroyo, he told me that he had been released from the penitentiary after serving five years for murder. When these cases came to us I used to write to Golenbock and asked him whether these cases had any chance, or whether I should flatly reject them and he told me that in filing the cases in admiralty instead of filing them as civil cases the doctrine of laches or negligence was applicable, and relying on the statute of limitation and to defend themselves, defendants had to prove not only that the prescriptive term had elapsed but also that prejudice had been caused to them as a result of the delay in filing the claim. This fact cleared the way for the

cases which had apparently prescribed; and when said news also spread among the workers, and it spread easily because they are always together, and each one is more of an attorney than the other, as soon as one said: 'I won my case and it was four years old,' the other, who had a three-year-old case then came also. In one case we presented in court all the members of the labor gang who had worked on the day of the accident and all the medical history of the State Insurance Fund; and we argued at court that there was no prejudice, since we had all the witnesses in court and the defendant was in the same position to defend himself as if it were the day after the accident, and we won a case apparently lost. Many workers, like this one, came to the office. I used to take the information which they could supply, which was often very meager, and I went, or one of the boys went, to the State Insurance Fund, which was the source of information, because they had the employer's report which indicated the date, vessel, witnesses. This reminds me of another thing which also happened. I do not know whether it was Donald Dexter or Atiles Moreu, who told me one day: 'you come here to examine the records, but you do not have a written authorization from your clients; and we are trusting your words without the written authorization.' Then we prepared a written contract which says: 'Professional Service Contract. We hereby authorize the law office of John Doe and Richard Roe,' etc., etc. and we used it as a professional service contract in our record and in the State Insurance Fund as authorization to examine the record. Later on I changed it, because that contract granted me one third. Then I prepared two contracts; one for the State Insurance Fund and the other for services in civil cases. That is how it increased and we obtained many cases. Some were rejected after the investigation. I remember a poor old man, who came, possibly about 1958, who had lost a leg in 1933, a perfect case of irresponsibility, but obviously prescribed. I remember an old man from here . . . from . . . how is that place down there called? . . . La Perla, he was 80 years old and he suffered an injury in a leg while at his work and, finally the case was transacted for $250. I would not do it now, because I have also learned, but I transacted for $250 and I did not charge him any fees. Then, he informed, I do not know whom, but at that time William Fred Santiago was occupying your position, and he called and told me that there

was a complaint, and I came and gave him the record and told him: if you can get more money from that record, I will pay for it. Some days later he called me, to return the record and told me to forget about the matter. I am not a newcomer American in search of fortune; and my wife is Puerto Rican, and my children are Puerto Ricans; and I am going to die here attorney or not attorney, but I will die here. (The witness cries) Excuse me, colleague.

"I have nothing more to say (Interruption)."

**Mr. Harvey B. Nachman's testimony offered on October 28, 1966.**

7. He was admitted to the bar in Puerto Rico in 1959. In 1958 he had already been admitted to practice law in the Federal Court. He recited his activities in New York as attorney in Golenbock's office and how the *Guerrido* case originated, originally filed in New York and subsequently transferred to Puerto Rico. As soon as Boston reversed there immediately arose 30, 40, 50, many more cases in the office in Puerto Rico. Golenbock requested Mr. César Andreu Ribas to litigate the cases here and the latter told him that he did not have knowledge in this field. Golenbock opened an office with Delgado González, but he did not have any knowledge either. The deponent then recommended Feldstein to him. In 1958 the first cases were already on the calendar of the Federal Court and the deponent came to litigate them, and later he litigated another case on the calendar for August, which Feldstein could not litigate by himself. In 1960 he and Feldstein were finished with Golenbock here.

"Which is the field on Law mostly practiced in your law office?

"Well, originally, it was the field of maritime cases; which was like an inheritance from Golenbock. But Stanley is . . . how do you say it? . . . very clever, and he has accountancy training too, and little by little, the office is dealing more with commercial and corporate matters and litigations concerning commercial cases. Now, we still have many cases in the maritime field, and also, now there are other attorneys in the field. Originally, all those who had cases, like Ortiz Toro, Carmelo Avila, 'sent' them

to us, but now there are many who are practicing in the same field.

.        .        .        .        .        .        .        .

"What kind of work was performed by Rafael Dapena and Edgar Irizarry?

"Investigation of the cases. When the men came to the office, let us suppose a man was injured here in San Juan. When he came for the first time, the accident had occurred maybe six months before, or a year before, because the workers usually came to us when they were discharged as cured by the Insurance Fund and sometimes it was two or three years and sometimes only six months after the accident occurred. The vessel had already left. They do not know the witnesses by their real names, and if one asked: who is your witness? A longshoreman answered: 'El Sapo', 'Plancha de Zinc', 'El Indio', we have to take all that information. We have to find out who is 'El Indio.' We have to go to the Fund because in the Fund, in the Report, there appear the names of the witnesses. Sometimes those appearing therein are not the ones informed by them. We had to send the investigators in those cases.

"In relation to the function of these investigators, what do you have to inform in view of the allegation in the complaint in the sense that the office solicited cases?

"Well, I do not know about other law offices, only about the law office where I work. (Interruption)

"I am referring to Nachman and Feldstein's law office.

"There is not a more honest law office than ours. All the cases came to the office or were recommended by one or the other attorney. Thank God, we never had to solicit cases. If you go to the office on Monday morning, you might see six men there asking us to take the representation in their cases. I know this is an evolution of the cases we originally had with Golenbock. And also, the work Stanley performed for these men in the Industrial Commission, because in the beginning we did not charge one cent for attorney's fees in the Industrial Commission. Stanley always waived his fees there, and also, and also, we received cases by mail. I do not know of any other law office here in Puerto Rico which has ever rendered so much service in Social Security, for example. I think that, personally, I have litigated more cases against Social Security, in relation to Social

Security matters, than all the other legal offices here in Puerto Rico. I can swear that we did not solicit any case of any kind whatsoever; that, often, we reject cases, especially after investigating them and losing time. I do not know whether it is pertinent, but a longshoreman came to us and said that he had been injured on board a Waterman's vessel and Rafi Dapena went to the Fund; and he obtained the report of the accident and there were the names of two witnesses; and I told Rafi, please take these statements, and Rafi told me that the witnesses refused to give their statements until the watchman gave his statement, too. Then, at last, the two witnesses and plaintiff came; and Rafi and I interviewed them, and on cross-examination I found out that the man was never injured on board the vessel. It happened while working on a farm which belonged to the watchman himself. I told him that he should report to his work because he could not go to the Fund, since the watchman did not carry labor insurance on his farm. I think that Rafi did a very good job, because imagine the position of an attorney, if the witnesses and plaintiff testify that the accident occurred on the vessel, when the man was never on board the vessel. The investigation is for the purpose of equal protection . . . they are alleging anything.

"Do you remember the case of a worker named Alfredo Viana Reyes?

"Very well.

"I am referring to a case which gave rise to a hearing in the Federal Court, in which the worker denied that he had given his consent to the law office to represent him in the case.

"Let me tell you. What actually happened was as follows: There was another case in the office recommended by Edgar Irizarry's cousin. He had a cousin who worked, if I am not mistaken, for Caribair, and she recommended a coemployee who came to us, and I think this coemployee's name is Morales Figueroa, or something like that. (Interruption)

"Figueroa Burgos?

"Yes, Figueroa Burgos. He came to the office with a plaster cast. I was taking the data. He was injured on board on a ladder set up behind a truck property of International Air Service. (Interruption)

"Who?

"Burgos.

"The man with the cast?

"With the cast. When I was taking the notes, he told me that there were witnesses who did not see the accident. I told him, how can a person be a witness if he did not see the accident?, and he told me: 'it was a man who injured himself on board, on the same ladder'; what we call notice witness, and then I asked Stanley to go to the hospital to take this witness' statement, because Burgos said that he still had the cast on, and he was injured about three months before on the same ladder. He went there (Interruption)

"Feldstein?

"Feldstein and Burgos and Edgar Irizarry, the three of them. Burgos had to introduce Stanley and the latter did not take a statement; he just took notes. The man told about his case and about other cases. I told him, when you are discharged from the hospital you may come to the office. The man came to the office; he signed a contract (Interruption)

"Viana?

"Viana Reyes came to the office. He signed a contract and we opened three cases in one; one, I am almost sure, was when his leg was injured, we could not bring an action against the same defendant because he is an employee of International Air Service; we had . . . we were investigating who was the manufacturer of that ladder so as to decide whether we could bring a case of nonfulfillment of warranty, but we never filed the complaint. There was another case. In this other case the man was injured on board a British West Indies Airways airplane, if I am not mistaken, and the man came to the office many times. I had to send him to the doctor. Originally Gonzalo Sifre answered the complaint for the British West Indies in this second case, and he, Gonzalo, filed a complaint against International Air Service, his very own employer, under a policy of damnification (Interruption)

"Indemnity.

"Indemnity, excuse me. Trías and Saldaña law office took the case, instead of the attorneys who took the other case of Burgos, because in the case of Burgos there was insurance, but International Air Service did not carry insurance for the indemnity contract. Then the case went on until the week before the trial. During that week I talked with the other . . . with my opposing colleague, Horacio Subirá. We met in the Supreme Court of

Puerto Rico, both of us were using the library thereof, and we discussed the case and came to an agreement of four thousand dollars for each one of the clients; and he said that he thought that it was very reasonable and that he was going to inform his client of it. It must be understood that his client did not carry insurance. The day before the trial this man called me from the International Air Service office and told me that he did not want to continue with the case. The next day, when I came to court, all the attorneys were there, because I asked them all, Gonzalo, also, in spite of the fact that Trías and Saldaña were representing British West Indies, to come to (Interruption)

"When Viana called, did he inform you that he did not want you to represent him?

"That he did not want to go on with the case. I went to court, and I called the other attorneys to ask them to come to court, and I told the court that I had to withdraw the case, but that I wanted the court to investigate the situation. I do not care for the case nor the fees, but I thought that an accident involving 'civil rights,' I had the impression that, it is difficult for me to say it in Spanish, I thought somebody was violating this man's civil rights. I told the court I am not going to represent this man anymore, but I request an investigation of this situation. I cannot remember whether the same day, or days later, we met in Clemente's office. The President of International Air Service, Viana Reyes, Horacio Subirá, Richard Francis, Sifre, Gil, the United States Attorney, eh . . . the stenographer and the judge were there; and during the hearing the judge noticed that my ex-client, Viana, was telling things which seemed lies, and warned him several times during the hearing as to prejudice (Interruption)

"Perjury.

"Perjury, and for the purpose of the investigation the Judge told the prosecuting attorney that he may conduct an investigation in whatever manner he deems proper, to find out whether anybody violated the civil rights of this man. I wanted to notify in writing to Viana Reyes that I was going to close, not only this case, but also his three cases that were in the office relating to his different accidents. So it was, I did not hear his name again until now.

"To what, if anything, do you attribute his conduct notwithstanding the fact that you say that he had signed a contract?

"He called me from International Air Service office and I am sure someone permitted him to work again; and in my opinion, this man, not as a result of the accident being considered in court, but as a result of the accident involving his leg, cannot perform any physical work for anybody. I thought somebody promised him this job just to ask him . . . to withdraw his case.

"Before whom did he sign the contract?

"Before me. In my office. When that man first came to my office, I did not know who he was, because I did not go with Burgos to interview him the first time. I had not seen him before he came to the office the first time.

"How long was it from the time he signed the contract before you to the time when he denied having authorized you to take the case?

"About two years. A tremendous investigation was being performed to find out about the agents who sold the ladder and to try to find out the manufacturers of that ladder. This is a special ladder which is set up, and it was a problem to acquire jurisdiction again.

"At what stage was the case when he withdrew it?

"Everything was ready for trial; the doctor, the witnesses were prepared for the trial, because it was an accident in which this man fell from an airplane and injured his mouth, some of his teeth; the doctor was ready. I was ready for the trial.

"Did you have an interview with Viana in your office?

"At least six or seven. That was the only place where I interviewed my clients, except for some rare cases. When I started to work here, I went to Mayagüez and to Ponce, maybe two or three times, and I performed an investigation with the aid of translators, Edgar Irizarry or Stanley, showing the investigators how they must take the statements; how they must investigate the facts, and before the trial, nearly always I go, if I can, to the place of the accident to ascertain myself how . . . where the accident happened and what were the conditions of the place of the accident. One time I went with Stanley to Ward Los Pájaros in Bayamón, to see two witnesses because I had a case with José Novas and the trial was already set, and we discussed the case during two or three days trying to come to an agreement, and Novas told me that if the witnesses are going to show how the accident occurred, maybe we can spare the accident (Interruption)

"The trial?

"The trial, excuse me. There are no telephones there and we went to Ward Los Pájaros. Stanley and I went there, and both of us chose the witnesses to come the next day, and luckily Novas was there, and he went with the witnesses to the pier. It was a case against Bull at pier No. 9. A strange case.

"How much was the claim in the case of Viana?

"I cannot remember. We always claimed large amounts. If we thought the case was not too serious, we usually claimed $25,000. If the case was more serious, we claimed fifty thousand; if the case was very serious, I claimed one hundred thousand dollars or more. Generally, the amount of the claim is much higher than what we expect to get in the case. Sometimes, the claim is altered after the complaint is filed, cases in which I believe that the claim is not sufficient. For example, I had a case in the Federal Court with Rafael González, in which the claim was for seventy thousand, and before the trial I thought that said amount was too small, and that a jury could bring a much 'higher' sentence. I was somewhat afraid and did not want to present a motion in court to amend the amount of the claim because, particularly in the presence of the jury, it does not seem proper. Obviously, originally I was right because the jury returned a verdict of twenty-six thousand dollars.

"Do you remember whether in this case there was a proposal for transaction?

"In this case?

"Yes.

"There was no proposal, but there was an agreement between Subirá and me for four thousand dollars. The proposal for transaction means to me, that another attorney has the authorization already, and in the cases I take, which are against companies outside Puerto Rico, generally, the other attorney does not have the authorization when we are discussing the transaction. For example, when I have cases with Toño Bird, sometimes we came to an agreement between $750, up to . . . the greatest amount I have here is eighty-eight thousand; he and I came to this agreement, but he had to write to New York, to England, therefor. The same with Subirá. If I have cases with Rivera Zayas' law office and they represent Maryland Casualty, which has agents here, when they offer any amount they already have authorization; but if it is Royal Glow, or any com-

pany which does not have an office here, they have to ask permission therefrom. I told Viana that I am trying to negotiate a transaction (Interruption)

"Now?

"No. Before the case was called for trial.

"What was his reaction?

"Satisfied and willing to settle the case.

"However, on the day of the hearing (Interruption)

"Because Subirá never received the authorization and we had to go to trial, and in the meantime he went to International Air Service and there, somebody told him something and then he called me from that office and told me that he does not want to go on with the case.

"Then, Viana's attitude in court was completely different in relation to his previous conduct?

"Yes. Not only that, but also he was very nervous there in the court and the judge warned him to answer the questions; and I did not ask the questions to Viana. I myself requested this investigation, and the judge granted it.

"In relation to the ports of Ponce and Mayagüez, did you go to the Union premises?

"As I told you before, I went there a very few times. I went to Mayagüez to investigate the case, a case that I did not take, Golenbock took it, Caballero is the name of the client; and the case I investigated, also, a case of Osorio Ríos, and I went with Stanley and with Irizarry twice. I went to Ponce to investigate the case of Marín Gutiérrez and some other cases. Once I went to Ponce without Stanley and with Rafael Dapena.

"Did you meet Félix Martínez in Ponce?

"Not in Ponce. I met Félix Martínez in my office as a chauffeur who brought clients to make depositions.

"Did the law office pay Martínez for that service?

"For what?

"For bringing clients?

"Sure.

"Was Félix Martínez paid for that?

"Always, just like any other chauffeur.

"Was there any arrangement between the law office and himself? Was he paid for that service?

"For the service. The law office paid for all the expenses of the case.

"Was a charge credited to the client?

"Yes. It stated: for deposition, trips, or any other thing. But in Ponce I do not remember Felo Martínez. Whenever I went to Ponce I went with Rafi; Rafi drove his own car, and I did not need a car in Ponce.

"Were the workers, whose cases were taken by the law office, ever required an advance payment or any amount for attorney's fees?

"No.

"Was everything liquidated at the end?

"Yes. These men are poor persons, and sometimes we had to spend a lot of money in the course of the case. For example, if I have to take depositions from the crew of a vessel, maybe these depositions would cost two hundred dollars. I cannot tell the client, give me two hundred dollars for these depositions; and he would ask, what do we need those depositions for, one thing or the other. Not only because I cannot explain to him, but because if I have to do that, I cannot be this man's counsel. Right now, I have a case referred to me by an attorney from Jacksonville, Florida, in which I have to use experts in atomics, and I cannot tell my client, you have to pay for this expert witness. Now, I am representing professor Samuel Polanco in a case; I had to use pathologists; I had to use engineers; I had to use a professor of mathematics, who was never used at the trial, but I had to pay him for an investigation verified by an eyewitness, and then we needed the expert testimony. There are some in which I have to send only one client to five different physicians. For example, a case I settled with Bird. An old Bull case. There was delay due to the bankruptcy of Bull there in New York. I had to send the client to at least six specialists; Dr. Rifkinson, Fred, Dr. Payne, to a psychologist, to a psychiatrist, two psychiatrists who saw him in the Industrial Commission. Then, each one of these items is entered in the docket of this case, and is taken from the check when there is a complete distribution and all expenses paid, with the check number and everything. Sometimes the expenses amount only to $85; and sometimes those expenses amount to thousands of dollars; and the client obtains the original of the final distribution with the check. It has always been that way, from the time we started. The situation is different when we represent a corporation. For example, if we are dealing with a corporation in an anti-

trust litigation or a stock and delivery suit, or a case under Act No. 75 of 1964, in which a dealer is suing a manufacturer for eliminating the representation, I am not going to take this case on a contingency; but I could give my time to this matter, but I would be taking a risk. Not in case of a corporation. If you or any other person comes to me with a case under Act No. 75, I would take it, but I would ask for an advance, an agreement to pay attorney's fees and expenses and if the expenses increase, you have to pay more.

"These employees, Irizarry and Dapena, were they ever stationed, one in Ponce and the other in Mayagüez?

"Never.

"I mean assigned to.

"Never. If investigations were necessary they made the trips by themselves when there were six cases or so at one time, but if a case was set for hearing and I wanted to go, like, for example, in the case of Marín Gutiérrez, Rafi and I went to Ponce; but no specific area had been assigned to either of them. I was the one who was always checking the records in the office, and checking the dates of prescription and the stage of the investigation and the preparation of the trial, because in a law office like this, one knows that eighty percent or more of the cases will be settled, but one does not know which of these cases will be and which will not be included within the percent to be settled. My philosophy is that every case should be prepared for trial, because at the last minute the defendant may say that he is not going to give the authorization—one is an attorney and should prepare his cases, and I am like Napoleon in that sense, in my office my cases are well prepared and investigated when the complaint is filed.

"For how long did Edgar and Dapena coincide in the office, that is, that they were working simultaneously?

"I cannot remember exactly how long they worked simultaneously. It was over a year, I am sure. Edgar Irizarry always had to work in the two businesses outside the office. He had a gasoline station in Cataño and a poultry farm somewhere else, and a lot of time he was away from the office and he said that he was making investigations, but we knew he was attending to his businesses, but he is a close friend, especially Stanley's, and I never discharge an employee from work, and Stanley cannot, either. Finally, Irizarry came to the office with a . . . that is

not the answer to your question, I do not know whether you are interested, but finally Irizarry came to the office with a business proposal concerning a corporation or factory of . . . How do you call them? . . . *telas* (fabrics) (Interruption)

"Velas (candles) ?

"Candles, with two men, one from Spain and the other from Venezuela, and at first Edgar wanted Stanley and I to invest money in this business. I said, in the first place, I have no money, and in the second place, if I were to invest money, I would not do it with these two men. He was very . . . How do you say it? . . .

"He was very annoyed?

"He was very annoyed. When he came to us to demand . . . to request tax exemption under the law, he said that if they had to pay attorney's fees or are going to request any service they offer shares to us therefor. We said no; that we were not going to work for a corporation under those conditions. From that time on, after we did not accept this proposition, Edgar Irizarry turned himself against us. He resigned his work. Immediately after that. One day he came to the office and punched Stanley; and after that he filed a claim for overtime in the Department of Labor. An investigator from the Department of Labor came and we put the office at his disposal, and he investigated everything and interviewed each and every one of the employees privately, including Rafi Dapena. Finally, the Department of Labor determined that Edgar Irizarry was not entitled to overtime at all. Thereafter, Edgar Irizarry filed another claim in another office of the Department of Labor in Bayamón. United States Attorney Gil and I met at the Federal Court and because of the motion I had (Interruption)

"Which motion?

"I have a case referred to me by Mr. Gerardo Ortiz del Rivero against the Federal Government, grounded on a practice of the Veterans Administration, and I think it is a good case. He referred it to us stating that he is not in a position to take civil cases; that he takes criminal cases. I filed the complaint. This is the case of Amalia Torres against the Federal Government. I filed a complaint against the Federal Government under the Federal Tort Claims Act. Immediately after that I received my client's telephone call saying that an investigator of the Veterans Administration was at her house requesting a sworn

statement. I told her that she should not sign anything or talk about anything or with anybody; only in my presence. That she should tell this man that any information, he may obtain from her attorney. She was crying and told me: 'But he says that I have to think it over and that I have to cooperate with the government.' Immediately I called United States Attorney Gil and told him that he should not do that. He told me that he was not going to intervene in interdepartmental matters of the government, and I told him, but you are the attorney for the government, and this is a suit, and you must behave like any attorney. He told me he was not going to intervene. Then I saw him the next day in court, day for motions, and another day I talked to him about the same matter and he answered the same thing. That he is not going to intervene in interdepartmental matters. Then, next week, the lady called me again, that the investigator was at her house requesting a sworn statement; and I told her not to sign anything; to come to the office next day, and when she came to the office the next day and in the presence of attorney Smith she made an affidavit on all that. Then, with the affidavit I filed a motion in the Federal Court requesting that the attorney . . . that the court order the attorney to behave according to the rules, and that the attorney could not use an ex parte subpoena, as he did in the other cases I had with him. Then we went to the court and argued this motion before Judge Cancio, but the attorney was outside Puerto Rico, and one of the other attorneys, Gierbolini or Córdova, argued this motion; and Cancio ordered all that I requested, and Judge Cancio told me you have to prepare an order; I prepared an order and sent it to the attorneys for approval. They immediately went to Judge Cancio's office, and that I received, excuse me, I received a telephone call from Mr. Passalacqua, Judge Cancio's secretary, and Mr. Passalacqua asked me whether I could argue the motion again next week when Mr. Gil would return from the United States. I told him yes. How could I say no to Judge Cancio's secretary? Then, on Friday I went to the Federal Court to argue again that same motion, this time with Mr. Gil. We argued the motion, and finally, United States Attorney Gil promised in open court that he will discontinue doing these things to this lady; that he is not going to molest her again. Then I requested that action be taken as to the second part of the motion. That is, the 'ex parte subpoena' and Gil told the

court that the office of the United States Attorney never acts like that, referring to the case of Vieques, but, luckily attorneys Ramos Vargas, Toño Bird and Fernández Cuyar were in court, and I told the court that I did not want it to balance the credibility of Mr. Gil and mine, but there were three prominent attorneys there, whom I could bring to the witness stand to testify that in cases they brought against the Federal Government, they encountered the same thing about the ex parte subpoena. Then, Mr. Gil became very angry and Judge Cancio said that he was sure that in the future Mr. Gil was not going to do that again, and the latter said that it was alright. When we departed Mr. Gil told me that 'now we are going after you.' Since then they are investigating. That happened in October of last year, if I can remember well.

"After Dapena and Edgar Irizarry quit working in your office, did any other person continue doing their work?

"Always.

"Who?

"Dapena quit because he had an offer in the Water Resources Authority for a higher position than what we could pay him, and I believe our relations with him are still very cordial. Besides, I have to use him in some cases which are pending. After Dapena quit Antonio Alvarez is working for us, because we cannot do without an investigator. We always have to use an investigator. Antonio Alvarez is working for us right now.

"I have no more questions. Do you have anything to add?

"I am ready to say anything. Only, can you tell me who are the persons that you mentioned to me at the beginning? You mentioned the names of Dapena, Edgar Irizarry, Félix Martínez, Viana Reyes, and there were two more.

"I read the complaint, and specifically at paragraph 3 it states: 'Enclosed and as part of the present complaint, sworn statements of Edgar Irizarry, Rafael Dapena, Félix Martínez, Gregorio Morales Ayala, Gregorio Arroyo, Alfredo Viana Reyes, and Alfredo Arroyo are included.'

"Gregorio Arroyo sounds familiar, but I cannot remember. I have seen him in the Federal Court. The opposing attorney was Mr. Torruellas from Fiddler's law office, and the jury was 'on home jury.' They could not come to an agreement after 8 hours of deliberations.

"Was this case settled?

"Yes. The other one is not our client. This was a case referred to us. This was an insignificant case referred to us by a New Jersey attorney.

"Who did actually refer cases to you in these port areas?

"Originally, in Ponce there were two attorneys, strangers in Puerto Rico, one called Samuel Cole and his partner. They referred to us a group of cases which they had already represented. At least 30 of them, at only one time, and that was one of these cases. Mr. Ortiz Toro, Mr. Amadeo Suro. I am not sure whether there were any dock cases among those referred by Charlie Juliá, but here . . . there are more.

"Did cases arise as a result of the visits made by Edgar Irizarry and Dapena to the docks?

"They did.

"Cases which came to the law office through the steps taken by them at the docks?

"In San Juan?

"In any place.

"I am sure that . . . When, for example, I went to Mayagüez and Ponce, when they were investigating or preparing a case for trial, there came other dock workers who told us: 'I have a case because I was injured on such a date, on such a vessel,' and at first we only took notes of the facts because very often they could not remember much; and we went to the Fund, and the Fund told us that without a contract with the clients we could not obtain information, and then sometimes . . . and originally there was a contract and later we changed it for two because in the Fund we could not get attorney's fees, only what is awarded by the Commission and we executed these contracts before investigating. I do not know why I was not with them, they went by themselves. I only know that in the office there is not a single case without a contract. I am sure they came to the office and said: 'In Ponce there are three men who say they have cases, Tom, Dick and Harry,' but they were not authorized to execute a contract because a contract must be executed before an attorney. To investigate, yes; but to execute contracts, no.

"I have nothing else to say.

"I do not have anything else, either."

8. According to the rules of this Court, which at this stage of the proceedings do not permit the respondents, in

922

disciplinary actions, to have knowledge of the facts recited by the witnesses in the investigation—extension of the theory of the secretive nature of the initial proceedings in criminal cases\*\*\*—I must refrain myself from reciting, summarizing or reproducing herein the testimonies of those witnesses. I have examined said statements and to me they fundamentally present the same set of actions as those presented by the respondent attorneys.

9. The determination of probable cause to prosecute, herein, as in every case in which a prosecution requires the violation of an act penalized or prohibited by law, is a judicial function discharged by taking into consideration not only the existence of certain facts charged, but also whether such acts constitute, in the light of the applicable law, acts subject to be prosecuted judicially.

Prior to stating some final conclusions, I want to refer to some decisions of the Supreme Court of the United States, which, in essence and spirit, are applicable to the situation of the present case, as to the circumstances of its facts.

In *Brotherhood of Railroad Trainmen* v. *Virginia, ex rel. Virginia State Bar*, 377 U.S. 1 (1964) the Supreme Court vacated an injunction issued at the request of the Virginia Bar Association (The American Bar Ass'n joined as amicus curiae urging the affirmance of judgment) which prohibited, as the unlawful solicitation of litigation and the unauthorized practice of law, a labor Union from encouraging its injured members or their families to obtain legal assistance for the prosecution of their claims, and recommending *specific* attorneys to offer said legal assistance.

It was decided that the injunction abridged certain rights under the First and Fourteenth Amendments.

---

\*\*\* Perhaps this rule should be eventually reexamined, particularly in cases of this kind, in the light of more advanced views on the rationality of the adversary proceeding.

That part of the injunction which enjoins from holding out lawyers selected by the Union as the only approved lawyers to aid the members or their families, and soliciting or encouraging such legal employment of the selected lawyers, was specifically objected to. The Union admitted that it performed such acts.

Holding that the guarantees of the First Amendment of freedom of speech, petition and assembly protected these Union workers in their right to help themselves and that the right to avail themselves of legal advice and to determine which lawyers were of their personal trust was inseparable from their constitutional right to assist and advise each other, the Court stated:

"Virginia undoubtedly has broad powers to regulate the practice of law within its borders; but we have had occasion in the past to recognize that in regulating the practice of law a State cannot ignore the rights of individuals secured by the Constitution. For as we said in *NAACP* v. *Button, supra,* 371 U.S., at 429, 'a State cannot foreclose the exercise of constitutional rights by mere labels.' Here what Virginia has sought to halt is not a commercialization of the legal profession which might threaten the moral and ethical fabric of the administration of justice. It is not 'ambulance chasing.'

.    .    .    .    .    .    .    .    .

"A State could not, by invoking the power to regulate the professional conduct of attorneys, infringe in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest. Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries, [citation] and for them to associate together to help one another to preserve and enforce rights granted them under federal laws cannot be condemned as a threat to legal ethics . . . The right to petition the courts cannot be so handicapped.

.    .    .    .    .    .    .    .    .

"In the present case the State again has failed to show any appreciable public interest in preventing the Brotherhood from carrying out its plan to recommend the lawyers it selects to

represent injured workers. . . . And, of course, lawyers accepting employment under this constitutionally protected plan have a like protection which the State cannot abridge."

Subsequently, in 1967, in *United Mine Workers* v. *Illinois St. Bar Ass'n*, 389 U.S. 217, the Supreme Court reaffirmed the preceding principles with a view to the employment of attorneys, by a Union, on salary or retainer basis, to represent its members and their dependants in claims in connection with labor accidents under said law of the State.

Vacating the injunction, enjoining those acts, decreed by Illinois at the request of the Bar, the Supreme Court decided that said injunction impaired the freedom of speech, assembly, and petition, provisions of the First Amendment, the latter being binding upon the States through the Fourteenth Amendment.

"The First Amendment would, however, be a hollow promise if it left government free to destroy or erode its guarantees by *'indirect restraints'* so long as no law is passed that prohibits free speech, press, petition, or assembly as such. We have therefore repeatedly held that laws which actually affect the exercise of these *'vital rights'* cannot be sustained merely because they were enacted for the purpose of dealing with some evil within the State's legislative competence . . . . [citations] . . . That the States have broad power to regulate the practice of law is, of course, beyond question. [citation] But it is equally apparent that broad rules framed to protect the public and to preserve respect for the administration of justice can in their actual operation significantly impair the value of associational freedoms. . . . The First Amendment does not protect speech and assembly only to the extent it can be characterized as 'political.' Great secular causes, with small ones, are guarded. . . . And the rights of free speech and a free press are not confined to any field of human interest." (Italics ours.)

Although there is some difference in the facts of all of them, the cases of *Railroad Trainmen* v. *Virginia Bar* and *United Mine Workers* v. *Illinois Bar* are reaffirmations of

the basic approaches made by the Supreme Court in *N.A.A.C.P.* v. *Button*, 371 U.S. 415 (1962).

The validity of a Virginia State statute which prohibited the "improper solicitation of legal business" as applied to N.A.A.C.P. was enjoined therein. The latter encouraged the presentation of cases in relation to its aims and purposes, and offered legal assistance through its attorneys. The Supreme Court of Appeals held that statute strengthened the existing statutes to further control the evils of solicitation of legal business, and concluded that the activities involved violated also canons 35 and 47 of the American Bar Association's Canons of Professional Ethics, adopted by Virginia. Reversing the decision which upheld the validity of the prohibition, the Court states:

"We meet at the outset the contention that 'solicitation' is wholly outside the area of freedoms protected by the First Amendment. To this contention there are two answers. The first is that a State cannot foreclose the exercise of constitutional rights by mere labels. The second is that abstract discussion is not the only species of communication which the Constitution protects; ....

"We conclude that under Chapter 33, as authoritatively construed by the Supreme Court of Appeals, a person who advises another that his legal rights have been infringed and refers him to a particular attorney or group of attorneys (. . .) for assistance has committed a crime, *as has the attorney* who knowingly renders assistance under such circumstances. . . .

"As this Court said in *Thomas* v. *Collins*, 323 U.S. 516, 537, 'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts.

. . . . . . . .

"The second contention is that Virginia has a subordinating interest in the regulation of the legal profession, embodied in Chapter 33. . . . The decisions of this Court have consistently held that only a *compelling* state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms. Thus it is no

answer to the constitutional claims asserted by petitioner to say, as the Virginia Supreme Court of Appeals has said, that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression. For a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights. [citations] . . . 'In the domain of these *indispensable* liberties, whether of speech, press, or association, the decisions of this Court recognize that abridgment of such rights, even though unintended, may inevitably follow from varied forms of governmental action.'" (Italics ours.)

10. Sir Francis Bacon said on his Essay of Judicature, that judges ought to weigh not only *the facts* but also *the circumstances* of each case.**** In this case, the circumstances are, in my opinion, convincing that there was no professional misconduct to justify, as the years go by, to compel these attorneys to confront a prosecution and to defend themselves of the accusation of such alleged misconduct, to wit:

i. Since the law office to which these attorneys belonged was the one which produced the rule of law which acknowledged to an infinite number of workers injured on board vessels in the territorial waters of Puerto Rico a cause of action in admiralty in the exclusive federal forum, it is natural and inevitable, that all the interested persons seek their intervention and their professional services.

ii. It was natural and inevitable that there be a large number of claims at the same time, especially in view of prescription or laches under the rules on admiralty.

iii. Since these workers were unionized, and since they were scattered throughout all the ports of Puerto Rico, and since there was *only one* forum in Puerto Rico for litigation, it was natural and inevitable that there be association between the Union or Unions to which these claimant-workers

---

**** 3 The Harvard Classics 132. *Judicis officium est, ut res, ita tempora rerum.*

belonged, the leaders of said Unions and these respondent attorneys.

      iv. Under the cases cited, they, the workers, and the attorneys, had a constitutional right to this association and communication, and constitutionally, they, the workers, and their attorneys, had the right to use such modes of association and communication which would permit the prosecution of said claims *most effectively*, in order that none of them be lost for lack of the proper information and procurement of the evidence and the witnesses, as well as to prevent, under the circumstances of the occurrence of the facts, the presentation of false or fabricated claims. The respondent-attorneys' testimonies satisfactorily explain the necessity of these modes of communication, also for their own protection against fraud and false information, which by the way, were not created by them, but rather that said modes had already been created by the law firm of New York which litigated labor cases in the Federal Court.

      v. In view of a class litigation which affected a great number of workers who were interested in it, it would be too candid to expect that each worker, without communicating or associating with the other unionized workers and their leaders, would, by himself, present his claim. Experience shows that that is not the way it occurs, and it has not occurred in relation to labor and unionized labor claims which have been litigated in our courts. The record shows that on one or more occasions when the workers resorted to other colleague attorneys, the latter, considering themselves unfamiliar with the matter, referred them to respondents. Since the time when one of the first labor cases on a large scale was litigated, which culminated in the liquidation of the Compañía del Ferrocarril in Puerto Rico, and in the course of an extensive litigation of this nature, of collective interest of a class through the years, where identical modes have been necessarily used (otherwise an effective profes-

sional action would have been impossible), our forum, at no time, has considered this an unprofessional practice of the prominent and famous attorneys who intervened.

11. Referring to the respondents' statements the Solicitor General invited the complainants, at that time Assistant United States Attorney Gilberto Gierbolini Ortiz, and United States Attorney Gil, to testify. The Solicitor General stated for the record that United States Attorney Gil refused to testify. Mr. Gierbolini testified. Subject to the established rule, I shall not state the facts testified by him. However, the witness made *a conclusion of law*, as a ground, in part, for his information, referring to an "annotation" that he had read in "American Law Report Second," in the sense that a law firm which controls a certain type of litigation in a court must alert the court that "ambulance chasing" may be incurred. He relied on the fact that the respondent firm occupied ¾ of the Federal Court calendar for hearings set for the years 1961 and 1962.

Those calendars appear in the record as documentary evidence. I am not going to disclose their content, but from the examination thereof there appears that the fact is a sequel, an inevitable result of the aforerecited circumstances on this litigation of class interest and of the large number of lawful claims which the decision in *Guerrido* in the Court of Appeals suddenly gave rise to. There is an overall relationship of cause and effect, not taken into consideration by the accuser, which contradicts his conclusion.

During several years I practiced law in representation of the Government in the former Tax Court. Later I was a judge therein. That court, like the Federal Court, was a court of special jurisdiction, over all the territory of Puerto Rico.

Nobody would think that a small number of famous attorneys of the forum were incurring unprofessional conduct like the one charged herein because they controlled, notice-

ably, the calendars of tax litigation. A similar fact of the so-called "control" occurs with the appearance of specific attorneys before specialized entities which exercise judicial function. It is the consequence of the specialization of certain areas of litigation.

Aside from their lawful right to receive fees as a consequence of the profession they practice, the circumstances of the record convince me that respondents performed social work in defense of the rights of many laborers and workers, several of them maimed, as a result of labor injuries, to obtain a lawful compensation granted by laws enacted by Congress, which had not been asserted.

In view of an indefinite and vague rule on professional conduct, which, being so, on particular situations may function accommodatingly, and which, untimely, it is sought to revendicate now after the lapse of several years, in my opinion, the proper balance falls on said professional work which resulted in great benefit for a class of poor and humble litigants, in great need of professional assistance under the circumstances it was obtained in the present case and which they do not find in other social spheres in which they are not admitted.[1]

As Judge Brennan states in *Button, supra,* referring to the vagueness of the rule:

"It makes no difference that the instant case was not a criminal prosecution. . . . The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. [citation] These freedoms are delicate and vulnerable, as well as

---

[1] Perhaps, because this rule is so vague and indefinite the Bar Association, to which, by law, corresponds the function par excellence to watch over said professional conduct, has not raised any contention before this Court, charging the violation of said rule.

supremely precious in our society. *The threat of sanctions* may deter their exercise almost as potently as *the actual application of sanctions.*" (Italics ours.)

I understand that this prosecution involves threats of sanctions in a constitutionally protected area, without the record containing sufficient ground to find probable cause of a prohibited professional practice. As I previously stated, this professional conduct was already tried in the proper forum, which is not lacking in rules of ethics and good conduct. As to the record itself, I fully agree with Mr. Hiram Cancio in the sense that it was not to be wondered that the complainants did not present the charges therein, as ordered, because the witnesses' allegations did not appear to be based upon any credible evidence of unprofessional acts.

I have stated the reasons for my dissent.